## LUTHER HALL v. STATE.

No. A-6620.   Opinion Filed June 1, 1929.
(277 Pac. 956.)

Claud Briggs, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted upon a charge of assault to commit rape, and was sentenced to be imprisoned in the county jail for 60 days and to pay a fine of $250. Motion for new trial was filed, considered, and overruled, and the defendant has appealed to this court.

The state to maintain the allegations in the information called Mrs. Ed. Howard, who stated:

"Ida Howard is my daughter, she was thirteen years old on the 3d day of May, 1925; Luther Hall was at our house on February 28, 1926; we lived at Gowen at the time; Ida asked my permission to go to the home of Ida Roe, I did not consent to her going at the time, but later on I consented."

Ida Howard was called as a witness and testified that:

"On February 28, 1926, I lived with my father and mother at Gowen, Okla.; I knew Luther Hall; on the 28th day of February, 1926, he was at our house about ten, or eleven o'clock; while he was there I asked my mother if I could go to Ida Roe's; she afterwards told me I could go if I would go down the highway; Luther Hall was there at the time; I left home to go to Ida Roe's about fifteen minutes after eleven, and went straight down the highway; I intersected the highway at Zaikawski's butcher shop; Luther Hall was there; he asked me if he could go with me and I told him no; he wanted to know where I was going and I told him I did not know and he got up and followed me, and I told him I was going to Lillie's; Luther said he was going down to where my brother Jesse was; I stopped and asked him where he was going and he said he was going with me, and put his hand on my arm, and I took both my hands and shoved him off, down in a ditch; this was just before I went down the hill; two cars passed, one was Billie Carmack and the other was Fred Tyler; they spoke to Luther; we went on down the highway and was talking; I was trying to get Luther to go back; he said he was going with me; he said mama did not want me to go by myself; we went down to the culvert, when I was in about ten feet of the culvert he grabbed me and threw me down; he asked me to let him play with my titties; I started to run and he caught me; he threw me down the embankment, he came down and picked me up and said, 'Right here is where I am going to get a piece of pussy,' I fought and scratched him and he could not get me down; we fought a little while and I got loose and run up the highway, and just after I got on the highway a car passed; after the car passed I started to run and fell down and he started to grab me, and I told him I would hollow, that I was on the highway where Bennett's could hear; he turned and went down to Arthur Bennett's; during our struggle we were up against the abutment of the culvert and he beat my head against the embankment when I was fighting him; about ten minutes after I got to Ida Roe's I told her what had happened; when I reached the Roe home, Guthrie Fulks, Ida Roe, Mrs. Roe and

Gladys were there; I reached Mrs. Roe's home before twelve o'clock."

On cross-examination witness stated that Luther Hall was a frequent visitor at their home; he was at their house the day of the alleged trouble, and as she started to Roe's he went to the butcher shop. She was asked the question, "Luther was always inclined to joke you," and answered, "Yes, sir, he was always joking me. He made me mad a few days before this; he was not teasing me the day we went down the road; I did not take his talking as a joke; I did not pucker up my lips and run out to him when he got down to the culvert; this scuffle I refer to did not take place under the culvert; it was right by the end of it; it was on the north side of the road; I did not think Luther acted like he was joking and teasing me; just when I got down near the ditch at the culvert he pulled up my dress and tried to pull my bloomers off; I was fighting and scratching him, anything I could do to get away; I do not know just where he had hold of me, as I was trying to get away; I was fighting with both hands; he did not get me down after I fell as I went down the embankment; he pushed me off the embankment and I fell down; he come and pulled me up and took me over by the end of the embankment; he did not have hold of my hands; he had hold of my titties with both hands; I was trying to get away; he was behind me and I don't know how I got loose; I got loose in some way and ran across a little branch; I was scared and mad; it looked to me like he was a wild man; when I commenced fighting and scratching he did not turn me loose, he was trying to take my bloomers off; I thought he intended to do what he said he was going to do; I was trying to get away; I am still mad at him; I told Ida Roe what had happened about fifteen minutes after I got to her house; he did not

tear any of my clothing; he bruised my head; the little knoll at the culvert run about half way under the culvert; the place was in plain view where people might be passing along the highway; there was a plain stretch of road nearly a mile, and a half mile east back to Gowen; the culvert was the only place along the highway where you could get out of sight or hide. This is the first place along the highway where anyone could be concealed; it is such a place that people coming along this road could be seen for a long distance. I told mother what had happened about four-thirty that afternoon when I got home; I did not tell her Luther followed me but I told her what had occurred at the culvert."

Ida May Roe, called as a witness, in substance testified that the place where they lived was on the highway; that she saw Ida Howard on that date, "she came to my house, she was walking pretty fast, seemed to be in a hurry; I was the first one to talk to her after she got to the house; she looked frightened and her shoes were muddy; I asked what was the matter, and she said she was out of breath, and to wait a minute and she would tell me, she waited a while and I asked her again and she asked me to come outside with her. On the way out she cleaned off her shoes; she told me she was tried to be raped by Luther Hall." Motion was made by the defendant to strike this from the record, which motion was overruled and defendant excepted.

On cross-examination witness stated her name was Ida Roe; since this alleged offense she married a brother of the prosecuting witness; "we lived about a half mile from this culvert at the time of the alleged offense; cannot see it from our house; to be concealed people would not have to be under the culvert, as there was a high bank there; from the culvert you can see a long ways up and

down the road; the road is part of the highway leading from Hartshorne to Gowen; a number of people travel this highway regularly."

Lillie Hankins, called as a witness, in substance testified she saw Luther Hall on the 28th day of February, 1926; "I lived at that time near Hartshorne, about half way between Hartshorne and Gowen; when I asked him what was the matter he said he had been walking fast and was sweating; he said he had been in a fight with some scabs; that he had stuck his knife in one of them; said he was going to beat it; it was along about the middle of the day when he came to my house; my husband was sick and I had been sitting up and did not cook my dinner at regular hours; he was a second double cousin; he talks too much, being kinda windy, I did not believe everything he said."

Fred Cottrell was called by the state, and testified to being down to the culvert and seeing tracks, could not tell whether they were men or women tracks; on cross-examination he stated he did not know whether there had been any one down there before he went down to examine the tracks or not; the little knoll where these tracks were found is near the culvert on the north side of the road, and extends partly under the culvert. This is, in substance, the testimony introduced by the state.

The defendant demurred to the evidence on behalf of the state, on the ground "that the testimony and evidence submitted on behalf of the state is wholly insufficient to warrant the jury in returning a verdict of guilty, and is wholly insufficient to authorize or justify a verdict on the charge contained in the information," which objection was overruled, and defendant excepted.

L. T. Hall, called as a witness on behalf of the defendant, testified he knew the defendant, Luther Hall:

"I am not in any way related to him by blood or marriage; on Tuesday morning after this alleged occurrence I went to the culvert on the highway west of the railroad where this offense was alleged to have taken place and made an examination of the grounds and tracks; I understand this offense was alleged to have been committed on Sunday about noon; it looked like there had been four different sizes of tracks; I saw no evidence of slipping or struggling."

This statement was objected to, and the court stated, "I think you had better describe the tracks." "The tracks just looked like the usual tracks, just like stepping around; I only saw a woman's track on the south side of the bridge; there were tracks on the little knoll to the north end of the culvert; I could not say just how high the culvert is, my judgment is, it is something like five feet, maybe five feet four; I am five feet ten inches, and I could almost walk under it; when I was there the ground under the culvert was muddy; I don't know whether it had rained any since the alleged offense and before the time I was there; there was water there when I examined it, and it covered all excepting the southeast corner; I saw tracks on the southeast corner, just the usual tracks, just looked like they had been stepping around; I did not see any woman's track, all the tracks I saw was like a small five shoe."

On cross-examination the witness stated he helped put in this culvert; "I have lived around Gowen for five or six years; I could not say how thick the concrete in the abutment of the culvert was, it must have been eighteen inches. Of course the girl could have been pushed up against the abutment, as the abutment runs from the ground up to the bridge; I saw tracks on the little knoll, about a number five shoe there in the mud; I never noticed any small tracks excepting on the little knoll; I remember

looking at a number of tracks, about four different sizes; the little knoll I speak of is about three feet, it kindly runs up under the bridge near the abutments."

Fred Tyler, called by the defendant, testified he lived at Gowen and knew the prosecuting witness, Ida Howard; that on the 28th day of February, the date this offense is alleged to have occurred, he overtook Luther Hall and Ida Howard on the road between Gowen and the concrete culvert; they were walking toward Hartshorne; "I was not driving the car, another fellow was, and we did not stop, we slowed down and asked if they wanted to ride, and she shook her head first and we said, 'Come on and ride,' and she said no, they would walk; we went on to Hartshorne." On cross-examination he stated Luther Hall did not say anything; "I was talking to both of them when I asked them to ride; this was about a quarter of a mile from the culvert."

Giff Loudermilk was called as a witness for the defendant and testified he knew Ida Howard; that on the 28th day of February, 1926, he saw the prosecuting witness and defendant walking on the highway; they were laughing and talking like two young people will; they were on the main highway between Hartshorne and Gowen, going towards Hartshorne. Luther Hall was a married man, and the girl was not married, just a kid of a girl.

In rebuttal the state called Jim Morris who stated he remembered something about the time of the occurrence; he was in a car with Fred Tyler driving out of town; they passed Luther Hall and Ida Howard; "Fred asked them to ride and no one said anything, we did not stop. I don't know whether the car slowed down or not."

On cross-examination he stated the did not remember if the curtains were up on the car; "I know Fred hollowed

at them and I don't know whether either of them said anything or not." The defendant rested. The following day the state moved the court to reopen the case for the purpose of showing the prosecuting witness was not the wife of the defendant. Defendant objected. The motion of the state was allowed, and defendant excepted. The state then showed by Mrs. Ed Howard that Ida Howard was not the wife of Luther Hall, and had never been his wife, and was not the wife of Luther Hall on the 28th day of February. The defendant moved to withdraw all testimony from the jury given by Mrs. Ed Howard after the state had rested, and the defendant closed his testimony, on the ground that it was not proper rebuttal. The motion was overruled, and defendant duly excepted. This is, in substance, the testimony offered.

The defendant assigned 11 errors alleged to have been committed by the court in the trial of his case, and in his brief has grouped them together and argues as follows:

First, errors of law prejudicial to the rights of the defendant. Insufficiency of the evidence to support the conviction. That the court erred in giving certain instructions, over the objections and exceptions of the defendant.

Under the first proposition it is urged by the defendant that the court committed errors of law prejudicial to the rights of the defendant during the trial of his case. The defendant with considerable force argues that the state relied in this case for conviction upon the information attempting to charge assault with intent to commit rape by means of force, and sets out the charging part of the information in this case. Then the defendant states that:

"It will be observed that in the charging part which attempts to set out the acts and particularly charge the

offense, it is not alleged that the acts were committed with intent to commit the crime but instead the allegation is declaring with the said attempt by force that he intended to accomplish an act of sexual intercourse."

Defendant in support of his contention relies upon the case of Bond v. State, 12 Okla. Cr. 160, 152 Pac. 809, in which the court held: "To constitute a good charge of attempt to commit the crime of rape under section 2803, Rev. Laws 1910, some act done towards the commission of the crime and the failure must be alleged, and it is also necessary to allege an intent to feloniously have sexual intercourse by committing a rape as defined by section 2414, Rev. Laws 1910."

Upon an examination of the case cited we find that the information in the case, stripped of verbiage, stated John Bond attempted to commit rape by attempting to have sexual intercourse with the prosecuting witness. No facts constituting the offense are set forth so the defendant and the court may know with what proof the allegations in the information are to be met. In this case, stripped of verbiage, the information charges that the defendant did unlawfully, wrongfully, and feloniously make an assault upon the body of Ida Howard with intent to have sexual intercourse with the said Ida Howard, and then sets forth the facts by stating:

"That said defendant did lay hands upon the said Ida Howard violently, and did throw the said Ida Howard to the ground with force and violence, and attempted to raise her skirts declaring with the said attempt by force that he intended to accomplish an act of sexual intercourse with the said Ida Howard. And that the said Ida Howard did resist the force and violence so attempted then and there by the said defendant and did prevent the accomplishment of the said act of sexual intercourse attempted by the said defendant."

The allegations in Bond v. State, supra, and in this case are different. In this case the information sets out in detail the acts committed by the defendant in his attempt to accomplish his purpose. We hold that the information in this case sufficiently charges the defendant with the crime of assault with intent to commit rape.

It is further alleged by the defendant that the court erred in permitting certain testimony offered over the objection of the defendant as to the report of the prosecuting witness made when she reached the Roe home. The defendant cites Welch v. State, 23 Okla. Cr. 74, 212 Pac. 449, as supporting his contention. After a careful study of the Welch Case we do not think the question involved in that case is in point, as the prosecuting witness when called by the state denied the assault, and the state then for conviction relied solely upon the statements it is claimed was made by the prosecuting witness soon after the assault. The court held, and properly so we think, that, where the prosecuting witness denies the assault with intent to rape, the particulars of the complaint made by her to a third person, or persons, shortly after the alleged assault was alleged to have been committed, were not a part of the res gestæ of the assault itself and do not amount to legal proof of the corpus delicti. In this case the prosecuting witness testified positively to the assault that was made upon her, the language used by the defendant at the time as to what his intent and purpose was, and the court did not err in permitting the testimony of Ida Roe as to what the prosecuting witness said to her within a few minutes after she reached the Roe home.

The defendant on his second proposition urges that the facts as related by the prosecuting witness are so unreasonable as to be wholly insufficient to support the

judgment of the court, and predicates his assignment as unreasonable on the grounds that the alleged offense occurred on the public highway, where numbers of people were continually driving to and fro along the highway, and then the defendant in his argument makes this statement: "That even if he did assault her in any manner he desisted of his own free will and not because she forced him to do so, or actually prevented the accomplishment of any unlawful act by resistance."

The defendant in his contention cites Witt v. State, 29 Okla. Cr. 357, 233 Pac. 788. In the Witt Case the court does not set out in detail the testimony in the record, stating:

"It will serve no good purpose to set out the facts disclosed by the record in this case, nor the many contradicted circumstances and unreasonable features in the evidence."

The record in this case fails to disclose any contradiction or inconsistencies in the testimony of the prosecuting witness. It is true the offense is alleged to have occurred upon a public highway at a culvert where all the proof shows is more than five feet from the ground to the top of the culvert. The testimony on behalf of the state and defendant show that two days after the alleged offense tracks were found on a little knoll where the prosecuting witness alleges the defendant had her, and that some of the tracks were in the mud near the abutment of the culvert. The tracks were not identified as the tracks of the defendant or prosecuting witness. There were several tracks, one looked like a No. 5 shoe. When the prosecuting witness reached the Roe home, she had mud on her feet. An effort was made to show that the prosecuting witness was "mad" at the defendant, and the prosecuting witness admitted that she was "mad" at the

defendant. The testimony shows that the defendant was at the home of the prosecuting witness that morning, and that he heard her ask permission of her mother to visit the Roe girl; that the mother finally consented. The defendant left the Howard home and was next seen by the prosecuting witness at a butcher shop along the route she was traveling to get to the Roe home; he followed her, and when asked where he was going, he said down the road, or over to where her brother Jesse was. Some testimony was introduced to show that the prosecuting witness and defendant were seen walking along the highway laughing and talking; the prosecuting witness admitted she was along the highway with him, and he continued to follow along and talk to her. All the testimony as to their being seen along the highway was prior to the time they reached the culvert mentioned in the testimony. No one testified they were together after leaving the culvert. When the prosecuting witness reached the Roe home the testimony tends to show she was excited and seemed out of breath; was there about fifteen minutes before she could tell Ida Roe what had happened. The testimony further tends to show that defendant visited a double cousin; when he arrived at her house he was excited and said he had had a row with a scab and stuck a knife in him and was going to beat it.

The defendant did not testify in the case, and the testimony of the prosecuting witness as to what took place at the culvert stands uncontradicted. The statements she makes are not contradicted or denied by the defendant.

The prosecuting witness in this case is a girl of immature years, and, so far as the record shows, a girl of limited experience. The defendant is a married man and should have known better than to be following this young girl along the highway, and if, as attempted to be shown

by his defense, he knew she was not feeling very kindly toward him. There is nothing in the record to indicate that the prosecuting witness was not so angry at the defendant that she would fabricate and falsify a statement like the one given by her in the trial of this case where the defendant had an opportunity to cross-examine.

We hold that the testimony in this case is sufficient to sustain the judgment. There are other errors alleged by the defendant, but upon an examination and careful study of the entire record they are not of sufficient merit to justify a reversal of this case.

The defendant in this case was accorded a fair and impartial trial. The court correctly declared the law. Finding no prejudicial errors in the record, the judgment is affirmed.

EDWARDS, P. J., concurs.

CHAPPELL, J., not participating.